United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDUCATIONAL IMPACT, et al., | Case No. 15-cv-04510-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS** |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, et al., | Docket No. 31 |
| Defendants. | |

Plaintiffs are Educational Impact, Inc. ("EI") and Teachscape Inc. ("Teach"). They have filed insurance-related claims against Defendants Travelers Property Casualty Company of America ("Travelers") and Axis Insurance Company ("Axis"). The claims are based on insurance policies that Teach obtained from Defendants. Teach has assigned all of its rights against Defendants to EI. Currently pending before the Court is a motion brought by one of these Defendants – *i.e.*, by Axis. More specifically, Axis has asked the Court for judgment on the pleadings. The pleadings at issue are the complaint (for, *inter alia*, breach of contract and bad faith), Axis's answer/counterclaim (for declaratory relief), and Plaintiffs' answer thereto. *See* Docket Nos. 1, 26, 28 (pleadings).

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Axis's motion.

## I.    FACTUAL & PROCEDURAL BACKGROUND

A motion for judgment on the pleadings, made pursuant to Rule 12(c), "'is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts.'" *Starshene Coates & Project Sentinel, Inc. v. Singh*, No. 1:14-cv-1910-LJO-SKO, 2016 U.S. Dist. LEXIS

3768, at *9-10 (E.D. Cal. Jan. 11, 2016); *see also Boler v. 3D Int'l, LLC*, No. 2:14-cv-00658-TLN-CKD, 2015 U.S. Dist. LEXIS 163850, at *4-5 (E.D. Cal. Dec. 7, 2015) (stating that, "[t]o prevail on a Rule 12(c) motion, the moving party must 'clearly establish [] on the face of the pleadings that no material issue of act remains to be resolved and that it is entitled to judgment as a matter of law'"). If there are disputed facts, then the allegations of the nonmoving party are taken as true. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1990) (stating that "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false"); *see also Ventress v. Japan Airlines*, 603 F.3d 676, 681 (9th Cir. 2010) (stating that, "'[a] judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law'").

The following facts are derived from the undisputed facts in the pleadings (including documents attached thereto) or from documents that the Court may consider, either pursuant to the doctrine of incorporation by reference or pursuant to judicial notice. Although Plaintiffs have objected to "AXIS's reference and inclusion of documents attached as exhibits to AXIS's counterclaims," Opp'n at 8 n.5, this objection lacks merit. As indicated above, in a motion for judgment on the pleadings, a court is entitled to consider allegations made in an answer so long as they are not in dispute with the allegations in the complaint. *See Nepsk, Inc. v. Town of Houlton*, 283 F.3d 1, 8 (1st Cir. 2002) (stating that "a Rule 12(c) motion must be filed at the close of pleadings, and must be based solely on the factual allegations in the complaint and answer"); *cf. Perez v. Wells Fargo N.A.*, 774 1329, 1337 (11th Cir. 2014) (stating that "[t]he rationale underlying Rule 12(c) further supports this notion [*i.e.*, that judgment on the pleadings is inappropriate when only a single pleading related to a claim has been filed]: that competing pleadings pertinent to the counterclaim be available for the court to consider on a motion for judgment on the pleadings"). In the instant case, the Court has allegations that are technically part of Axis's counterclaims, but those allegations are implicitly part of Axis's answer as well. Moreover, the bottom line is that Plaintiffs filed a responsive pleading to Axis's counterclaims, which also allows Axis to move for judgment on the pleadings. *See* Fed. R. Civ. P. 12(c)

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   (providing that, "[a]fter the pleadings are closed – but early enough not to delay trial – *a party*

2   may move for judgment on the pleadings") (emphasis added).  Plaintiffs' responsive pleading does

3   not dispute, *e.g.*, the existence of the documents attached to Axis's counterclaims.

4   A.   <u>General Background</u>

5   Teach "is in the business of developing, constructing, marketing, and selling educational

6   products and services to teachers, administrators, schools, . . . and other organizations in the field

7   of education."  Compl. ¶ 25.  Teach's "products and services include professional development for

8   teachers and administrators, teacher evaluation software, and online training."  Compl. ¶ 25.

9   Teach obtained an insurance policy from Axis that provided Errors and Omissions

10  ("E&O") coverage.  *See* Compl. ¶ 2.  The policy covered the period July 19, 2013, to May 25,

11  2014.  *See* Compl. ¶ 20; Countercl. ¶ 1.  In the currently pending action, Plaintiffs assert that Axis

12  breached the terms of the insurance policy by not providing Teach with a defense and indemnity

13  with respect to several lawsuits filed against Teach and its customers.  Plaintiffs also assert that,

14  by not providing a defense and indemnity, Axis acted in bad faith.

15  B.   <u>Underlying Actions</u>

16  As noted above, Plaintiffs have alleged both breach of contract and bad faith because Axis

17  refused to provide Teach with a defense and indemnity with respect to several lawsuits.  Those

18  lawsuits were all filed by EI (to whom Teach has now assigned its rights against Defendants).

19  One lawsuit EI filed was against Teach directly; that lawsuit shall hereinafter be referred to as the

20  **New Jersey lawsuit or action**.  The remaining lawsuits (three total) were filed against customers

21  of Teach; those lawsuits shall hereinafter be referred to as the **customer lawsuits or actions**.

22  Collectively, the New Jersey and customer lawsuits shall be referred as the **underlying lawsuits**

23  **or actions**.  The underlying actions are briefly discussed below.

24  1.   <u>New Jersey Lawsuit</u>

25  In February 2014, EI sued Teach (as well as others) in a federal district court in New

26  Jersey (Case No. C-14-0937 FLW (LHG) (D.N.J.)).  In that complaint, EI alleged as follows.

27  "EI is in the business of developing, creating, marketing, and selling online professional

28  development programs and services that include programs and services specifically for teacher

**United States District Court**
For the Northern District of California

1  evaluation and training." N.J. Compl. ¶ 10.  In 2006, EI entered into a contract with Charlotte

2  Danielson, the author of a book titled "Enhancing Professional Practice – A Framework for

3  Teaching." N.J. Compl. ¶¶ 14, 27.  "The content of [Ms. Danielson's] book included a rubric [–]

4  commonly referred to as the 'Framework for Teaching' [–] [which was] designed to define good

5  teaching and provide a system for teacher evaluation." N.J. Compl. ¶ 15.

6       Under the terms of EI's contract with Ms. Danielson, "the parties would work together to

7  design and create a video-based online professional development program . . . based on [Ms.]

8  Danielson's Framework for Teaching rubric.  The Framework for Teaching Online Program

9  would use real classroom video already owned by EI, and combine it with new video of Danielson

10  commentary filmed by EI." N.J. Compl. ¶ 28.  The contract between EI and Ms. Danielson

11  "included a non-compete clause, which prohibited [Ms.] Danielson [and an affiliated entity] from

12  creating or helping to create an online program that would compete with EI's Framework for

13  Teaching Online Program." N.J. Compl. ¶ 40.

14       EI began to market its Framework for Teaching Online Program in 2008.  *See* N.J. Compl.

15  ¶ 42.  Consistent with the terms of the contract between EI and Ms. Danielson, additional content

16  to the Program was added in 2009.  *See* N.J. Compl. ¶¶ 47, 49.  "In 2011, at the request of [Ms.]

17  Danielson, EI again updated the Framework for Teaching Online Program." N.J. Compl. ¶ 56.

18  "[Ms.] Danielson insisted that EI include in the Framework for Teaching Online Program the most

19  updated version of the Framework for Teaching rubric, which was the 2011 iteration." N.J.

20  Compl. ¶ 56.

21       Sometime in 2010, *i.e.*, before EI's 2011 update, "[Ms.] Danielson began a dialogue with

22  Teachscape on developing a 'psychometric assessment tool.'" N.J. Compl. ¶ 57.  "[Ms.]

23  Danielson assured EI that any psychometric tool developed by Teachscape would not compete

24  with EI, and in particular would not compete with EI's Framework for Teaching Online Program."

25  N.J. Compl. ¶ 58.

26       In 2012, Ms. Danielson informed EI that

27

28                she had entered into an exclusive arrangement with Teachscape.
              The result of the exclusive arrangement was that both [Ms.]

> Danielson and all of the consultants and trainers that were part of [an affiliated entity] would no longer be able to work with EI in any capacity.  This included several independent members of the [affiliated entity] that had previously referred business to EI and had been paid commissions.

N.J. Compl. ¶ 62.

Subsequently, EI learned that Ms. Danielson and Teach had actually "partnered to create a series of online programs that competed directly with EI's Framework for Teaching Online Program."  N.J. Compl. ¶ 65.

"Starting in 2012, Teachscape began inaccurately representing to the K-12 marketplace that Teachscape's arrangement with [Ms.] Danielson made Teachscape the only business in the industry that could legally market and sell professional development programs for the 2011 iteration of the Framework for Teaching."  N.J. Compl. ¶ 70.  *See, e.g.*, N.J. Compl., Ex. C (press release, dated March 29, 2012); N.J. Compl., Ex. D (Teachscape's website).

Based on, *inter alia*, the above allegations, EI asserted claims against both Ms. Danielson and entities affiliated with her, as well as against Teach.  The main claim against Ms. Danielson was breach of contract.  *See* N.J. Compl. ¶ 90 *et seq.*  More specifically, EI alleged that Ms. Danielson had "breached the non-compete clause [in their agreement] by licensing content to Teachscape and assisting Teachscape in creating a competing product."  N.J. Compl. ¶ 93.  The claims against Teach were as follows:

- *Violation of the Lanham Act, 15 U.S.C. § 1125(a).*  According to EI, Teach's "advertising and promotional claims . . . constitute false and/or misleading descriptions of fact in interstate commercial advertising and promotion, as they materially misrepresent that Teachscape's are the only software products authorized for use with the 2011 Edition of [Ms.] Danielson's Framework for Teaching."  N.J. Compl. ¶ 78.  In fact "EI was granted explicit authorization by [Ms.] Danielson to use the 2011 Edition of her Framework for Teaching with their online software program and training manual."  N.J. Compl. ¶ 79.

- *Unfair competition (under Pennsylvania common law).*  As above, EI alleged that Teach "made false or misleading statements that Teachscape digital products are the only digital products authorized for use with the 2011 and 2013 Editions of Danielson's Framework for

Teaching."  N.J. Compl. ¶ 86.

- *Tortious interference with contract.*  According to EI, Teach knew that Ms. Danielson had a contract with EI and that, under that contract, she could not create a competing product. *See* N.J. Compl. ¶¶ 99-100.  Nonetheless, Teach "caused or induced [Ms.] Danielson . . . to violate [her] contractual duties."  N.J. Compl. ¶ 101.

- *Tortious interference with current and prospective economic advantage.*  EI alleged that it "had an ongoing business relationship with trainers and consultants who were independent contractors of the Danielson Group [an entity affiliated with Ms. Danielson]."  N.J. Compl. ¶ 105.  Before Ms. Danielson began dealing with Teach, "EI received numerous business referrals from those independent contractors."  N.J. Compl. ¶ 106.  However, Teach, Ms. Danielson, and her affiliated entities "interfered with EI's business by instructing the independent contractors to cease making referrals to EI, and compelling the independent contractors' compliance by threatening to exclude the independent contractors from any future business relationship with Defendants."  N.J. Compl. ¶ 108.

- *Injunctive relief.*  With respect to Teach, EI asked for an injunction prohibiting it from continued sale of the competing online program and prohibiting it from continuing to make misrepresentations.  *See* N.J. Compl. ¶ 115.

In May 2014 (*i.e.*, a few months after initiating the case), EI filed an amended complaint. The amended complaint contains many of the same allegations, although it clarifies that EI was authorized to use both the 2011 and 2013 editions of Ms. Danielson's Framework for Teaching (and not just the 2011 edition).  The amended complaint also contains allegations that EI was given an *exclusive* license to the Framework for Teaching for the purpose of creating programs such as the Framework for Teaching Online Program.  *See, e.g.*, N.J. FAC ¶ 120 ("Teachscape and the Danielson Group [tortiously interfered with the contract between EI and Ms. Danielson] without privilege or justification because they acted with knowledge of and intentional disregard for EI's rights as the exclusive licensee of the Framework for Teaching for the purpose of creating programs such as the Framework for Teaching Online Program.").  Finally, the amended complaint makes a reference to the fact that there was a copyright in the Framework for Teaching,

United States District Court
For the Northern District of California

*see* N.J. FAC ¶ 84 (alleging that a "copyright notice is displayed at multiple locations on the websites of The Danielson Group [affiliated with Ms. Danielson] and Teachscape," which states, *inter alia*, that attempts to publish the Framework for Teaching Evaluation Instrument would be "'deemed to be an illegal expropriation of [Ms.] Danielson's intellectual property rights'") – more specifically, as an example of how Teach was "inaccurately representing to the K-12 marketplace that Teachscape's arrangement with [Ms.] Danielson made Teachscape the only business in the industry that could legally market and sell professional development programs based on the 2011 iteration of the Framework for Teaching." N.J. FAC ¶ 81.

> 2.   Customer Actions

In September 2014 (*i.e.*, several months after filing the New Jersey action), EI filed lawsuits against three of Teach's customers, namely, the New York City Department of Education ("New York") (Case No. 1:14-cv-05177-DLI-MDG (E.D.N.Y.)); the Rochester City School District ("Rochester") (Case No. 6:14-cv-06503 (W.D.N.Y.)), and the Pittsburgh Public School District ("Pittsburgh") (Case No. 2:14-cv-01272-RCM (W.D. Pa.)). *See* Compl. ¶ 30 & Exs. H-J (complaints in customer actions). In each of the customer actions, EI expressly pled a claim of copyright infringement. The basic allegations in each customer action are as follows.

First, the Framework for Teaching is a protected work registered with the U.S. Copyright Office. *See, e.g.*, N.Y. Compl. ¶¶ 12, 25. Second, EI "is the exclusive licensee of the right to create a derivative work of the Charlotte Danielson Framework for Teaching in the form of an online or CD-ROM-based teacher training program." N.Y. Compl. ¶ 24. Third, each government entity "has purchased and continues to use an infringing online teacher training program based on the Charlotte Danielson Framework for Teaching."[1] N.Y. Compl. ¶ 26.

After being sued, each of the customers identified above demanded in writing that Teach indemnify it with respect to the lawsuit filed by EI. *See* Compl. ¶ 30 & Exs. K-M (customer

---

[1] In the New Jersey action, Teach filed counterclaims against EI based on, *inter alia*, the customer actions. For example, Teach asserted a Lanham Act violation against EI, alleging that "[t]he claims that EI owns rights in Danielson's [Framework for Teaching], that the Teachscape Products infringe EI copyrights in the [Framework for Teaching], and that the School Districts infringe EI copyrights by their purchase and use of Teachscape Products are knowingly false and misleading, and made in bad faith." N.J. Am. Countercl. ¶ 22 (filed in March 2015).

7

demands).  For example:

- Rochester, written demand made on March 27, 2015.  *See* Compl., Ex. K (in an e-mail, dated March 27, 2015, "demand[ing] that Teachscape provide defense and indemnification to [Rochester]").  In a prior communication, dated September 16, 2014, Rochester stated to Teach: Rochester "is simply Teachscape's customer here and an innocent bystander to whatever disputes there are between EI and Teachscape.  Hopefully, Teachscape will step up and deal with the lawsuit on [Rochester's] behalf."  Compl., Ex. K (e-mail) (also stating that "I anticipate reviewing the matter in detail and exploring [Rochester's] legal rights to demand defense and indemnification").

- New York, written demand made on March 27, 2015.  *See* Compl., Ex. L (in an e-mail, dated March 27, 2015, stating that New York "forwarded the complaint . . . on September 16, 2014 and demanded that Teachscape defend and indemnify"[2]).

C.    <u>Tendering Claims</u>

    1.    <u>New Jersey Lawsuit</u>

With respect to the New Jersey lawsuit, Teach appears to have tendered a claim to Axis on April 4, 2014 (*i.e.*, approximately two months after the lawsuit was filed).  *See* Countercl. ¶ 3 & Ex. 1 (e-mail).  On April 15, 2014, Axis asked Teach for documentation to assist in its review of Teach's claim.  *See* Countercl., Ex. 2 (e-mail).  Teach responded with some documentation.  On May 15, 2014, Axis asked for more documentation and/or information.  *See* Countercl., Ex. 2 (e-mail).  Teach again responded.

On June 9, 2014, Axis sent a letter to Teach stating that, "based on the information available, there is no potential for coverage with respect to the [New Jersey] action under the Policy.  AXIS therefore respectfully declines to defend or indemnify with respect to the action."  Countercl., Ex. 4 (letter).  Almost a year later, Teach asked Axis to reconsider.  *See* Countercl., Ex. 26 (letter).  In a letter dated May 15, 2015, Axis reaffirmed its decision denying coverage.  *See*

---

[2] It is not clear whether the September 16, 2014, communication from New York included a *written* demand.  This is important because, under the policy, "Claim" is defined as "a written demand or written assertion of a legal right made against any **Insured** seeking **Damages** or non-monetary relief."  Policy at 10.

United States District Court
For the Northern District of California

Countercl., Ex. 31 (letter).

2.     Customer Actions

As to the customer actions, Axis received notice of tender on October 17, 2014.  *See* Countercl. ¶ 20 & Ex. 11 (e-mail).  On October 22, 2014, Axis asked Teach to provide certain documentation.  *See* Countercl., Ex. 13 (e-mail).  On March 10, 2015, after not receiving any response from Teach, Axis informed Teach that, because Teach had not provided documentation,

> at this point it is not clear whether actual 'Claims' have been made against Teachscape with respect to the lawsuits filed against the school districts.  In any case, . . . the court in the [New Jersey] action has enjoined the prosecution of the school district actions pending resolution of the [New Jersey] action.  In light of the above, AXIS will defer its coverage determination with respect to the school actions until/unless the stay is lifted, actual claims have been made against Teachscape, and AXIS receives the information previously requested.

Countercl., Ex. 13 (e-mail).

The next day, March 11, 2015, Teach responded, stating, *inter alia*, "[w]hile you responded to your insured's tender of the Customer Suits with an unreasonably broad discovery demand – and failed to provide your insured the defense it paid AXIS substantially for – we moved immediately to obtain a court order that may limit substantially AXIS's potential exposure for the coverage it agreed to provide Teachscape."  Countercl., Ex. 13 (e-mail).  Teach was making reference to the fact that (back in September 2014) it had moved the New Jersey court for an order enjoining EI's prosecution of copyright infringement actions against Teach customers.  *See* Countercl., Ex. 10 (motion).  That motion was ultimately granted in November 2014.[3]  *See* Countercl. ¶ 25 & Ex. 16 (order enjoining EI from prosecuting the three customer actions and from filing future copyright lawsuits against Teach customers "that are similar in nature").)  After receiving Teach's response, Axis reiterated its position that Teach had not adequately established coverage.  Axis again asked Teach for documentation.  *See* Counterclaim, Ex. 13 (e-mail).

---

[3] Subsequently, on March 23, 2015, the New Jersey district court modified its order enjoining EI from filing copyright lawsuits against Teach customers.  EI was allowed to file such lawsuits, "provided, however, that such suits shall be stayed immediately upon filing."  Countercl., Ex. 24 (order).

United States District Court
For the Northern District of California

1    On April 3, 2015, Teach sent Axis documentation, including, *inter alia*, the demands from

2 its customers.  *See* Countercl. ¶ 41 & Ex. 27 (demands).

3    On May 15, 2015, Axis sent a letter to Teach regarding the customer actions, stating that

4 "AXIS has determined that no policy obligation exists."  Countercl., Ex. 31 (letter).

5 D.    Insurance Policy Terms

6    As reflected in the complaint, Teach[4] takes the position that both the New Jersey action

7 and the customer actions are covered by the insurance policy it obtained from Axis.  Teach points

8 to the following provisions in the Axis insurance policy: (1) **Technology and Professional**

9 **Liability** and (2) **Content Liability**.[5]

10    1.    Technology and Professional Liability

11    The Technology and Professional Liability provision states in relevant part as follows:

12

13    The **Company** [Axis] will pay on behalf of the **Insured** [Teach]
     those sums . . . which the **Insured** becomes legally obligated to pay

14    as **Damages** or **Claim Expense** because of a **Claim** arising out of a
     **Wrongful Act** committed:

15    a.    By the **Insured** in the performance of **Technology**

16       **Services**[6] for others for compensation.

17    . . . .

18    c.    By the **Insured** in the performance of **Professional**
         **Services**[7] for others for compensation.

19

20 Policy at 20.

21    For purposes of the Technology and Professional Liability provision, "**Wrongful Act**" is

22 ─────────────────────────

23 [4] The Court acknowledges that both Teach and EI are named Plaintiffs and that Teach has assigned its rights to EI.  However, to avoid confusion, the Court generally refers to Plaintiffs as "Teach."

24 [5] Following are excerpts from the policy.  The excerpts contain bolded terms.  The bolded terms

25 are all bolded in the original policy.

26 [6] "Technology Services" are defined as, *inter alia*, "[a]ny computer or electronic services, including licensing, developing, marketing, installing, maintaining, supporting, repairing and

27 training in the use of electronic or computer related hardware or software."  Policy at 15.

28 [7] "Professional Services" are defined as "those services that are listed by endorsement to this policy."  Policy at 14.

**United States District Court**
For the Northern District of California

defined as, *inter alia*, (1) a "[n]egligent act, error, or omissions, which shall include a negligent act, error or omission that results in copyright infringement of software but only if such infringement arises out of **Technology Services** or software developed or created by the **Insured** and distributed, licensed or sold to others by the **Insured** for compensation," or (2) an unintentional breach of contract.  Policy at 15.

        2.     <u>Content Liability</u>

The Content Liability provision states in relevant part as follows:

> The **Company** will pay on behalf of the **Insured** those sums . . . which the **Insured** becomes legally obligated to pay as **Damages** or **Claim Expense** because of a **Claim** arising out of a **Wrongful Act** committed by the **Insured** in obtaining, processing, uttering or disseminating **Matter** in the course of performing **Technology Services** or **Professional Services** . . . .

Policy at 2.

For purposes of the Content Liability provision, "Wrongful Act" is defined as, *inter alia*, (1) "[d]efamation or other tort related to disparagement or harm to the character, reputation or feelings of any person or organization, including . . . product disparagement"; (2) "[i]nfringement of title, slogan, trademark, [etc.], including any related misuse of such intellectual property rights in **Matter**"; or (3) "[i]nfringement of copyright, including any related misuse of such intellectual property rights in **Matter**, provided, however, this does not include copyright infringement of software."  Policy at 16.

"Matter" is defined as

> communicative or informational content regardless of the nature or form of such content, including content disseminated electronically and/or digitally when authorized or controlled by the **Insured** (e.g. via websites, chat rooms, bulletin boards, databases and blogs), and including **Advertising** disseminated by the **Named Insured** or by others on behalf of the **Named Insured** in any medium, including the Internet.  "**Matter**" does not mean **Advertising by Insured**.

Policy at 13.  "Advertising by Insured" means "advertising, publicity or promotion of any kind of the **Insured's** products and services."  Policy at 10.

3.      Exclusions

Axis contests coverage under the Technology and Professional Services Liability and Content Liability provisions.  In addition, Axis argues that, even if there were coverage, two exclusions are applicable in the instant case, namely, (1) Exclusion A.15 and (2) Exclusion A.16. The exclusions read in relevant part as follows:

> The **Company** is not obligated to pay **Damages** or **Claim Expense** or defend **Claims** for or arising directly or indirectly out of:
>
> . . . .
>
> 15.     Breach of contract, representation, warranty or guarantee, except for:
>
>> a.      Allegations of breach of contract arising out of any **Insured's** liability that would have attached in the absence of such contract;
>>
>> b.      Liabilities **Assumed Under Contract**; . . .
>
> . . . .
>
> 16.     **Advertising by Insured** and Contests.

Policy at 5.

"Assumed Under Contract" means "liability assumed by the **Insured** in the form of hold harmless or indemnity agreements executed with any party, but only as respects the types of **Claims** specified in **Section I.A.2** [*i.e.*, Content Liability] arising out of a **Wrongful Act** in obtaining, processing, uttering or disseminating **Matter** in the course of performing **Technology Services** or **Professional Services**."  Policy at 10.

## II.     DISCUSSION

A.      Legal Standard

> Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

United States District Court
For the Northern District of California

> "Analysis under Rule 12(c) is substantially identical to analysis under [Federal Rule of Civil Procedure 12(b)(6)] because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (internal quotation marks omitted). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

*Batuhan v. Assurity Fin. Servs., LLC*, No. 15-cv-04526-WHO, 2015 U.S. Dist. LEXIS 163138, at *4-5 (N.D. Cal. Dec. 3, 2015).

In the instant case, Axis has moved for judgment on the pleadings as to the entire lawsuit – *i.e.*, both with respect to coverage of the New Jersey lawsuit and to coverage of the customer actions. The New Jersey lawsuit and the customer actions are addressed separately below.

B.   New Jersey Lawsuit

In addressing whether the claims based on the New Jersey lawsuit should be dismissed, the Court considers first whether a coverage provision applies. If so, the Court then considers whether an exclusion to coverage also applies.

1.   Coverage

Coverage clauses in insurance policies are interpreted "broadly, protecting the objectively reasonable expectations of the insured." *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990). Consistent with this approach, ambiguities are generally resolved in favor of coverage. *See id.* In assessing coverage in the instant case, the Court also bears in mind that an "insurer's duty to defend is broader than its duty to indemnify. The latter duty runs only to claims that are actually covered by the policy, while the duty to defend extends to claims that are merely *potentially* covered." *Crawford v. Weather Shield Mfg. Inc.*, 44 Cal. 4th 541, 547 (2008) (emphasis added); *see also Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993) (stating that "[t]he [insurer's] defense duty is a continuing one, arising on tender of defense and

13

1    lasting until the underlying lawsuit is concluded, or until it has been shown that there is *no*

2    potential for coverage") (emphasis in original).

3         As indicated above, Teach asserts in the case at bar that there is coverage under both the

4    Technology and Professional Liability provision and the Content Liability provision.

5              a.    <u>Technology and Professional Liability Provision</u>

6    The Technology and Professional Liability provision states in relevant part as follows:

7

8         The **Company** [Axis] will pay on behalf of the **Insured** [Teach]
          those sums . . . which the **Insured** becomes legally obligated to pay
          as **Damages** or **Claim Expense** because of a **Claim** arising out of a
9         **Wrongful Act** committed:

10        b.    By the **Insured** in the performance of **Technology Services**
                for others for compensation.

11

12   . . . .

13        c.    By the **Insured** in the performance of **Professional Services**
                for others for compensation.

14   Policy at 20.

15        Axis argues that there is no coverage under the Technology and Professional Liability

16   provision because the provision only applies to the performance of services "*for others* for

17   compensation."  Policy at 2 (emphasis added).  According to Axis, coverage is precluded because

18   Teach wrongfully acquired Ms. Danielson's Framework for Teaching *for itself*, and not "for

19   others."  This argument is without merit.  While Teach may have acquired Ms. Danielson's

20   Framework for Teaching for its own business benefit, EI's New Jersey Action was based on

21   Teach's conduct in performing Technology or Professional Services *for Teach customers* for

22   compensation.  In particular, Teach provided its customers with a software product – one that

23   allegedly improperly competed with EI's Framework for Teaching Online Program and which

24   could have provided the basis of a copyright infringement claim.[8]  *See* Policy at 15 (providing that

25

26   [8] As discussed more fully below, even if no copyright claim was formally pled against Teach in
     the New Jersey action, the pleadings could have been fairly amended to state a covered liability
27   relating to claims against Teach.  *See Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654
     (2005) (stating "that the precise causes of action pled by the third party complaint may fall outside
28   policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably
     inferable, or otherwise known, the complaint could fairly be amended to state a covered liability).

United States District Court
For the Northern District of California

1  a Wrongful Act is, *inter alia*, a "[n]egligent act, error, or omission, which shall include a negligent

2  act, error or omission that results in copyright infringement of software").

3          b.    <u>Content Liability Provision</u>

4      The Content Liability provision states in relevant part as follows:

5

6          The **Company** will pay on behalf of the **Insured** those sums . . .
   which the **Insured** becomes legally obligated to pay as **Damages** or

7          **Claim Expense** because of a **Claim** arising out of a **Wrongful Act**
   committed by the **Insured** in obtaining, processing, uttering or
   disseminating **Matter** in the course of performing **Technology**

8          **Services** or **Professional Services** . . . .

9  Policy at 2.  "'**Matter**' does not mean Advertising by Insured."  Policy at 13.  "Advertising by

10  Insured" means "advertising, publicity or promotion of any kind of the Insured's products and

11  services."  Policy at 10.

12      In its papers, Axis argues that there is no Content Liability coverage for at least some of

13  the claims asserted in the New Jersey action[9] because the above provision requires that the

14  Wrongful Act involve the dissemination of Matter, and Matter is specifically defined to exclude

15  Advertising by Insured.[10]  Axis maintains that the only information that has been disseminated in

16  the instant case – as pled in the New Jersey action – is advertising by Teach.  *See, e.g.*, N.J.

17  Compl. ¶ 78 (alleging that Teach's "advertising and promotional claims . . . constitute false and/or

18  misleading descriptions of fact in interstate commercial advertising and promotion, as they

19  materially misrepresent that Teachscape's are the only software products authorized for use with

20  the 2011 Edition of [Ms.] Danielson's Framework for Teaching").

21      While Axis's argument is not without merit, it fails to take into account that EI's New

22  Jersey complaint could have been amended to assert a claim other than false advertising – more

23  specifically, for copyright infringement, which does constitute a Wrongful Act under the Content

24

25  ───────────────
   [9] These included claims for unfair competition, tortious interference with current and prospective

26  economic advantage, violations of the Lanham Act, and injunctive relief.

27  [10] Axis also raised the same argument as it relates to Exclusion A.16 for "claims for or arising
   directly or indirectly out of: . . . Advertising by Insured" (*i.e.*, that there was no potential coverage

28  for the first two, and the fifth and sixth claims in the New Jersey action, because the Policy does
   not afford coverage for "Advertising by Insured").  Policy at 5-6.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

Liability provision.  *See* Policy at 16 (defining "Wrongful Act" as, *inter alia*, "[i]nfringement of copyright, including any related misuse of such intellectual property rights in **Matter**, provided, however, this does not include copyright infringement of software").  Although the Policy provides that "this does not include copyright infringement of software," Policy at 16, the copyrighted work at issue here – *i.e.*, the Framework for Teaching – does not appear to be a software product itself; instead, the copyrighted work was used to make a software product.[11]

That the New Jersey action did not expressly assert a claim for copyright infringement is not dispositive.  Under California law, "[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim *potentially* covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage."  *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005) (emphasis added); *see also Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 276 (1966) ("Defendant cannot construct a formal fortress of the third party's pleadings and retreat behind its walls.  The pleadings are malleable, changeable and amendable.").

It is true the face of the complaint in the New Jersey action did not *clearly* state facts from which it could be inferred that EI could bring a copyright infringement action against Teach.  The complaint refers to expropriation of Ms. Danielson's intellectual property rights and merely describes a copyright notice.  *See, e.g.*, N.J. FAC ¶ 120 (alleging that "Teachscape and the

---

[11] Although the copyrighted work (Copyright No. TXu001820353) is described as an electronic file, the basis of the claim is *text and editing*.  Also, in the New Jersey action, Ms. Danielson's amended answer/counterclaim makes the following allegation:

> In each of the School Suits, EI asserts a single claim for infringement of the copyright in Charlotte Danielson's book entitled "Enhancing Professional Practice – A Framework for Teaching" published in 1996 and "subsequent iterations" published in 2007, 2011, and 2013.  The Second Edition of "Enhancing Professional Practice – A Framework for Teaching" was published in 2007, but Ms. Danielson's 2011 and 2013 books were not subsequent editions of those works, but two editions of a different work: "The Framework for Teaching Evaluation Instrument."  Nevertheless, all of Ms. Danielson's works in which EI is claiming a copyright interest in the School Suits will be referred to herein as the "FFT."

Danielson Am. Countercl. ¶ 122.

16

United States District Court
For the Northern District of California

1   Danielson Group [tortiously interfered with the contract between EI and Ms. Danielson] without

2   privilege or justification because they acted with knowledge of and intentional disregard for EI's

3   rights as the *exclusive* licensee of the Framework for Teaching for the purpose of creating

4   programs such as the Framework for Teaching Online Program") (emphasis added); N.J. FAC ¶

5   84 (alleging that a "*copyright notice* is displayed at multiple locations on the websites of The

6   Danielson Group [affiliated with Ms. Danielson] and Teachscape," which states, *inter alia*, that

7   attempts to publish the Framework for Teaching Evaluation Instrument would be "'deemed to be

8   an *illegal expropriation of [Ms.] Danielson's intellectual property rights*'") (emphasis added).

9          Nevertheless, the New Jersey complaint could be amended to plead copyright infringement

10  by Teach since a copyrighted work (Framework for Teaching) was at the core of Teach's product;

11  this possibility was especially apparent after Axis received notice that EI had sued three of

12  Teach's customers expressly for copyright infringement.  *See Gray*, 65 Cal. 2d at 275-76 (noting

13  that the insurer is also not restricted to the facts in the complaint when determining whether there

14  is a duty to defend – the duty can also be triggered by "facts which the insurer learns from . . . the

15  insured, or other sources"); *Montrose*, 6 Cal. 4th at 291 (noting that evidence extrinsic to the

16  underlying complaint can also trigger a duty to defend).  The only way the customers could have

17  infringed Ms. Danielson's copyright (of which EI was the alleged exclusive licensee) was *through*

18  Teach by purchasing and using Teach's Framework for Teaching product.  *See Perfect 10 Inc. v.*

19  *Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) (a plaintiff may allege a claim for indirect

20  copyright infringement by either alleging contributory or vicarious infringement);  *Sony Corp. of*

21  *Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434, 486 (1984) (Although "[t]he Copyright Act

22  does not expressly render anyone liable for infringement committed by another," these doctrines

23  of secondary liability emerged from common law principles and are well established in the law);

24  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 942 (2005) (Ginsburg, J.

25  concurring) (("Liability under our jurisprudence may be predicated on actively encouraging (or

26  inducing) infringement through specific acts . . . or on distributing a product distributees use to

27  infringe copyrights, if the product is not capable of "substantial" or "commercially significant"

28  noninfringing uses")).

17

1    Accordingly, the Court rejects Axis's contention that there is no coverage under either the

2  Technology and Professional Services Liability or Content Liability provision.

3        2.    Exclusion

4             a.    Breach-of-Contract Exclusion

5    Axis asserts that, even if there is coverage under either of the above-cited provisions, it is

6  still entitled to judgment under the pleadings based on an exclusion – in particular, the breach-of-

7  contract exclusion.  That exclusion reads, in relevant part, as follows:

8

9            The **Company** is not obligated to pay **Damages** or **Claim Expense**
             or defend **Claims** for or arising directly or indirectly out of:

10   . . . .

11

12       15.    Breach of contract, representation, warranty or guarantee,
                except for:

13            a.    Allegations of breach of contract arising out of any
                   **Insured's** liability that would have attached in the

14                 absence of such contract;

15            b.    Liabilities **Assumed Under Contract**; . . .

16       . . . .

17  Policy at 5.  "Assumed Under Contract" means "liability assumed by the **Insured** in the form of

18  hold harmless or indemnity agreements executed with any party, but only as respects the types of

19  **Claims** specified in **Section I.A.2** [*i.e.*, Content Liability] arising out of a **Wrongful Act** in

20  obtaining, processing, uttering or disseminating **Matter** in the course of performing **Technology**

21  **Services** or **Professional Services**."  Policy at 10.

22    In assessing Axis's exclusion argument, the Court bears in mind that, under California law,

23  exclusions from, or limitations to, coverage are interpreted narrowly.  *See Smith Kandal Real*

24  *Estate v. Cont'l Cas. Co.*, 67 Cal. App. 4th 406, 414 (1998) (interpreting exclusion narrowly in

25  favor of coverage and finding duty to defend).  "[A]n exclusion or limitation on coverage must be

26  clearly stated and will be strictly construed against the insurer."  *Id.*

27    Furthermore, the Court should consider the purpose behind this specific exclusion.  Courts

28  have indicated that the general purpose behind a breach-of-contract exclusion is to ensure that the

**United States District Court**
For the Northern District of California

18

United States District Court
For the Northern District of California

insured does not breach its contracts with impunity with the expectation to pass the cost off to the insurer. *See Trenches, Inc. v. Hanover Ins. Co.*, No. SACV 12-627 AG (RNBx), 2012 U.S. Dist. LEXIS 190868, at *20 (C.D. Cal. Aug. 10, 2012). This purpose is similar to the purpose behind California's exclusion for intentional or willful acts. *See, e.g.*, *Capachi v. Glens Falls Ins. Co.*, 215 Cal. App. 2d Supp. 843, 849 (App. Dep't Super Ct. 1963) (indicating that policy exclusion for willful acts by the insured is founded upon public policy that no individual should be able to contract to relieve himself of responsibility for his own wrong); *Dart Indus., Inc. v. Liberty Mut. Ins. Co.*, 484 F.2d 1295, 1298 (9th Cir. 1973) (noting that the rationale for exclusions for willful acts is that, as a matter of public policy, the wrongdoer should not profit from his own wrongdoing or that the wrongdoer should not be indemnified against the effects of his wrongdoing).

This purpose is embodied in the specific breach-of-contract exclusion in the instant case: the Technology and Professional Services Liability provision covers *unintentional* breaches of contract. *See* Policy at 15 (defining "Wrongful Act" for purposes of the Technology and Professional Liability provision as, *inter alia*, an unintentional breach of contract). It is also substantiated by the fact that the breach-of-contract exclusion contains an exception for Liabilities Assumed Under Contract. As noted above, "Assumed Under Contract" means "liability assumed by the **Insured** in the form of hold harmless or indemnity agreements executed with any party," Policy at 5, which thereby indicates that the "insured" must be a contracting party.

The Court rejects Axis's contention that the breach-of-contract exclusion applies because EI's claims arise out of *Ms. Danielson's* (not Teach's) alleged breach of a contract with EI; the breached contract was one to which *Ms. Danielson*, not Teach, was a party. That is, Teach was not a party to the contract between EI and Ms. Danielson, it did not breach that agreement, and it did not exercise control over Ms. Danielson's alleged breach of the agreement. The claims in the underlying cases did not arise out of Teach's breach of any of *its* contracts. Hence, this is not the type of factual scenario that properly falls within the ambit of Exclusion A.15.

Axis knew how to how to draft an insurance policy excluding coverage based on a third party's actions. *See* Policy at 5 (Exclusion A.9) (precluding coverage for "Claims for or arising directly or indirectly out of . . . the actual or threatened discharge, dispersal or release of any

19

1    Pollutant" regardless of "whether or not the pollution was sudden, accidental, gradual, intended,

2    expected or preventable *or whether or not any Insured caused or contributed to the pollution*")

3    (emphasis added).  It did not do so here; the exclusion is keyed instead to the *insured's* act of

4    breaching a contract.

5           Cases cited by Axis in support of its position – *Southgate Recreation & Park Dist. v. Assn'*

6    *for Park & Recreation Ins.*, 106 Cal. App. 4th 293 (2003) and *Medill v. Westport Ins. Corp.*, 143

7    Cal. App. 4th 819 (2006) – are distinguishable.[12]  In *Southgate*, Southgate Recreation and Park

8    District – the insured – contracted with a general contractor to build a golf course.  *See Southgate*,

9    106 Cal. App. 4th at 296.   Prior to completing the project, the general contractor went bankrupt,

10   and unpaid subcontractors sued Southgate and its directors seeking payment for goods and

11   services that they had rendered.  *See id.* at 296-97.  The claims brought by the subcontractors

12   included conversion, breach of trust, and violation of stop notice, all based on Southgate's alleged

13   negligent or improper administration of the general contractor's construction contract funds on

14   behalf of the subcontractors.  *See id.* at 301.   Southgate sought defense and indemnity for those

15   claims from its insurer, but there was an exclusion from coverage for any liability "[a]rising out of

16   or related to construction . . . contracts or to any other contract for the purchase of goods or

17   services."  *Id.* at 301.   The state court held that this exclusion was applicable, noting first that

18   "[a]rising out of is a broad concept requiring only a slight connection or an incidental relationship

19   between the injury and the excluded risk.  Such language requires [the court] to examine the

20   conduct underlying the   . . . lawsuit, instead of the legal theories attached to the conduct."  *Id.*

21   (internal quotation marks omitted).  The court then held that the subcontractor's claims for failure

22   to pay – which were "based on Southgate's alleged negligent or improper administration of the

23   [general contractor] construction contract funds" – "fit comfortably within the construction

24   contract exclusion" as they arose out of or were related to a construction contract administered by

25   Southgate.  *Id.* at 301-02.

26

27   _____

     [12] While both *Southgate* and *Medill* emphasize that the phrase "arising out of" is broadly
28   interpreted, even when used in an exclusion, that does not answer the question of whose breach
     and whose contract Exclusion A.15 targets.

United States District Court
For the Northern District of California

*Southgate* is distinguishable from the instant case for several reasons.  First, technically, insurance law principles did not even apply in *Southgate* – only general contract principles – because a pooling agreement was at issue, *i.e.*, an alternative to commercial insurance.  *See Southgate*, 106 Cal. App. 4th at 297-98; *see also City of South El Monte v. S. Cal. Jt. Powers Ins. Auth.*, 38 Cal. App. 4th 1629, 1633-34 (1995) (explaining how California cities experienced an insurance crisis in the 1970s and sought self-insured liability pools as an alternative to commercial insurance; thus, the court applied principles of contract law, rather than principles of insurance law, to resolve coverage).  Accordingly, the court in *Southgate* did not have to consider, as here, the fact that exclusions are narrowly interpreted in insurance cases.

Second, *Southgate* did not even find coverage in the first instance – the subcontractors' claims for conversion, breach of trust, and violation of stop notice did not fall under the "personal injury" offense of "violation of property rights" contained in the memorandum of coverage.  *See id*. at 300.  Therefore, the court's exclusion discussion was not even necessary to its opinion.

Third, the exclusion at issue in *Southgate* was one for "liability arising out of or related to construction contract."  *Id.* at 301.  This is broader than the breach-of-contract exclusion here.  The exclusion in *Southgate* was not limited to claims "arising out of" contracts; it included claims "related to" such contracts.

Finally, and most importantly, the construction contract at issue in *Southgate* was a contract to which Southgate was in fact a party and over which it had the duty and power to administer – *i.e.*, the contract between Southgate and the general contractor.  As the court noted, "Southgate's alleged negligence and breach of statutory duties arise out of or are related to the Southgate-Flint [*i.e.*, the general contractor] construction contract[;] [i]t is Southgate's failure to retain funds under that very contract and Southgate's failure to ensure an adequate payment bond for that very contract that comprise the basis of the subcontractor lawsuits against Southgate".  *Id*. at 302.  The case at bar is different because the contract at issue involved only Ms. Danielson and EI; Teach was not a part to that contract and had no role in its performance or administration.

As for the second California case on which Axis relies, *Medill*, it is equally unavailing.  In *Medill*, the insureds were officers and directors of Heritage Housing Development, Inc.  (The

United States District Court
For the Northern District of California

1    policy was formally purchased by Heritage but, under the policy, an insured included any person

2    acting with the course and scope of his or her duties on behalf of Heritage who was or is, *inter*

3    *alia*, an officer or director.)  *See Medill*, 143 Cal. App. 4th at 822, 825.  Heritage was a nonprofit

4    organization that raised money through municipal bond offerings for the purpose of financing,

5    *e.g.*, the renovation of healthcare facilities for the elderly and Alzheimer's patients.  *See id.* at 823.

6    The bonds were structured so that the obligations of the municipal issuers were assigned to

7    Heritage entities pursuant to indentures or loan agreements.  *See id.*  The insureds were sued in a

8    class action by bondholders after many facility renovations were not completed, the facilities went

9    into receivership-foreclosure (shortly after the bond offerings), and the Heritage entities defaulted

10   on their bond repayment obligations.  *See id.* at 822, 824.  The bondholders charged the insureds

11   with negligence and breach-of-fiduciary duties in violation of both federal and state law.  *See id.* at

12   824.

13          The insureds – *i.e.*, the Heritage officers and directors – submitted a claim to the insurer

14   who denied coverage.  The insurer found no coverage because loss was expressly defined not to

15   include damages arising out of breach of contract.  *See id.* at 822.  The insureds argued that the

16   breach-of-contract exclusion should not have applied because "none of the plaintiffs in the bond

17   litigation asserted any claims for breach of contract against [the insureds] or alleged any privity of

18   contract between plaintiffs and [the insureds] or that [the insureds] were personally liable for any

19   other party's failure to pay on the bonds."  *Id.* at 829.  The state court disagreed, stating:

20

21              [T]he plaintiffs in the underlying bond litigation are seeking to
                recover damages for the failure of the Heritage entities to perform
22              their contractual obligations to make repayments on the bonds.
                Plaintiffs allege that these defaults were caused in part by the
23              improper transfer of money among the various Heritage entities in
                violation of the terms of the loan agreements and indentures, and by
24              the wrongful conduct of the directors and officers in connection with
                the issuance of the bonds and mismanagement of the bond funds and
25              bond-funded projects.  In other words, the bond litigation in its
                entirety 'arises out of' breach of contract.

26   *Id.*

27          Like *Southgate*, *Medill* is distinguishable from the instant case.  While the insureds, as

28   officers and directors, were not parties to any contract themselves, their employer Heritage clearly

                                                    22

was – Heritage had contractual obligations to make repayments on the bonds – and Heritage

breached these contractual obligations as a result of conduct that the insureds themselves had

engaged in.  As in *Southgate*, the insureds had legal authority over conduct at issue which

constituted the breach of contract.

     *Medill* is consistent with the general policy that underlies a breach-of-contract exclusion

discussed above – an insured cannot intentionally breach a contract to which it is a party and then

pass off cost to the insurer.  In *Medill*, the insureds, officers and directors of Heritage engaged in

acts on behalf of Heritage, which contributed to the breach of contract.  Their willful conduct was

properly excluded from insurance coverage.

     To the extent Axis relies on cases other than *Southgate* and *Medill*, the Court does not find

that authority helpful as they involve non-California courts opining on non-California law.[13]

     Accordingly, the Court concludes that the breach-of-contract exclusion does not apply

given the facts pled in the parties' pleadings.

---

[13] Some of the cases Axis cited did not discuss or apply a comparable California rule that exclusions are narrowly construed.  *See Gemini Ins. Co. v. The Andy Boyd Co. LLC*, 243 Fed. Appx. 814 (5th Cir. 2007); *PetroNet LLC v. Hartford Acc. & Indem. Co.*, No. 10-3675 (DWF/JJK), 2011 U.S. Dist. LEXIS 79893 (D. Minn. July 21, 2011); *Radianse, Inc. v. Twin City Fire Ins. Co.*, No. 10-10120-RGS, 2010 U.S. Dist. LEXIS 106778 (D. Mass. Oct. 6, 2010). *Capitol Spec. Ins. v. Indus. Elecs., LLC*, 407 Fed. Appx. 47, 50 (6th Cir. 2011), is also factually distinguishable.  In *Capitol*, the insured was a company named Indel who had hired an employee named Yuriy Osyka.  Before Indel hired Mr. Osyka, Mr. Osyka was employed by a different company, ICS.  *See Capitol*, 407 Fed. Appx. at 47.  Mr. Osyka signed employment agreements with ICS that contained provisions prohibiting him "from competing with ICS or disclosing ICS's confidential information or trade secrets during his employment and for a period of two years from the end of his employment."  *Id.* at 48.  After Mr. Oskya joined Indel, he allegedly disclosed to Indel "customer and pricing lists and other proprietary information from ICS computer files" and "Indel used this information to its advantage and to the detriment of ICS."  *Id.*  ICS sued both Mr. Osyka and Indel alleging several claims, including a claim that Mr. Osyka breached his contract with ICS by disclosing proprietary and trade secret information to Indel.  *See id.*  Indel sought coverage under a commercial general liability policy issued by Capitol.  *See id.*  Capitol filed a declaratory judgment action in federal court, seeking a declaration that it had no duty to defend or indemnify Indel and Mr. Osyka in the underlying state court action.  *Id.*  The Sixth Circuit held that the exclusion for "'[p]ersonal and advertising injury' arising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement,'" applied, as ICS's claims against both Mr. Osyka and Indel arose directly from Mr. Osyka's breach of contract.  *See id.* at 50-51.  The fact that ICS sued only Mr. Osyka, and not Indel, for breach of contract was of no consequence, as the exclusion required only that the injury arise out of "*a* breach of contract."  *Id.* (emphasis in original).  Although the insured Intel in *Capitol* was not a party to contract (the employment agreement), the breach took place while the *individual was an employee* of the insured and was done *on the insured's behalf*.  Hence, Osyka's conduct could legally be attributed to the insured, a situation not extant as between Ms. Danielson and Teach.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

b.   California Insurance Code § 533

Aside from the breach-of-contract exclusion, the only remaining exclusion identified by Axis is the implied exclusion provided for by California Insurance Code § 533. Section 533 provides that "an insurer is not liable for a loss caused by the willful act of the insured." Cal. Ins. Code § 533. This exclusion is "to be read into all insurance policies." *J. C. Penney Cas. Ins. Co. v. M. K.*, 52 Cal. 3d 1009, 1019 (1991). Thus, even if a policy contains no express "intentional injury" exclusion, § 533 operates to exclude coverage for willful acts. *See Clemmer v. Hartford Ins. Co.*, 22 Cal. 3d 865, 880 (1978).

In the case at bar, Axis asserts that § 533 precludes coverage for EI's two tortious interference claims[14] because they required proof that Teach specifically intended to harm EI. In response, Teach asserts that Axis still had a duty to defend these claims because the complaint in the New Jersey action could have been fairly amended to include *negligent* conduct. In reply, Axis argues that such an amendment would not have been viable because Pennsylvania law[15] does not recognize negligent interference with contract claims that result in economic loss. *See, e.g.*, *Getty Ref. & Mktg. Co. v. MT FADI B*, 766 F.2d 829, 832 (3d Cir. 1985) (stating that "[t]he courts today, with the exception of one or two isolated cases, have adopted a bright line rule that precludes recovery of the loss of financial benefits of a contract or of prospective trade because of negligent interference with a contractual relationship absent physical damage or injury"); *Aikens v. Baltimore & Ohio R. Co.*, 348 Pa. Super. 17, 20 (1986) (stating that "recovery for purely economic loss occasioned by tortious interference with contract or economic advantage is not available under a negligence theory"); *Cox v. Calabrese*, 50 Pa. D. & C. 3d 624, 627 (Pa. Com. Pl. 1986) (noting that a negligent interference with contract cause of action does not exist if it results in damages that are purely economic).

Axis is correct that a negligent interference with contract claim would not have been

---

[14] EI pled claims for tortious interference with contract and prospective economic advantage. The New Jersey court dismissed the tortious interference with prospective economic advantage claim because it was time barred by the two-year statute of limitations.

[15] The New Jersey Court applied Pennsylvania law to resolve state law issues in that case. Countercl. ¶ 25.

24

United States District Court
For the Northern District of California

1  legally viable under Pennsylvania law.  If such were the only claim at issue, there would be no

2  duty to defend.  *See Purplus Inc. v. Hartford Cas. Ins.*, C 12-03689 JSW, 2013 WL 1149768, at

3  *1, 5-6 (N.D. Cal. Mar. 19, 2013) (policy did not provide coverage for copyright and trademark

4  claims, and there were no facts upon which the insured could rely to amend its complaint to state a

5  legally viable claim).

6        But here, as noted above, there is at least one potentially covered claim (*i.e.*, copyright

7  infringement), and so the insurer must defend an entire action, even when some claims in a

8  complaint are potentially covered and others are not, at least as a temporary, prophylactic matter.

9  *See Buss v. Superior*, 16 Cal. 4th 35, 48-49 (1997)  (stating that, "in a 'mixed' action, in which

10  some of the claims are at least potentially covered and the others are not," an insurer still has "a

11  duty to defend the action in its entirety" as a prophylactic measure; "[t]o defend meaningfully, the

12  insurer must defend immediately" and, "to defend immediately, it must defend entirely" and

13  "cannot parse the claims, diving those that are at least potentially covered from those that are not"

14  as "[to] do so would be time consuming" and "might also be futile"); *see also St. Paul Fire &*

15  *Mar. Ins. Co. v. Centex Homes*, No. ED CV14-01216 AB (JCx), 2014 U.S. Dist. LEXIS 145882,

16  at *14-15 (C.D. Cal. Oct. 7, 2014) (noting that, for a mixed claim, "California law imposes a

17  temporary, 'prophylactic' duty on the insurer to defend against the entire action, subject to later

18  reimbursement for defense costs incurred in defense of the uncovered losses").  Consequently,

19  Axis still had a duty to defend the New Jersey action.

20        3.    Summary

21        In summary, the Court concludes that there is coverage under both the Technology and

22  Professional Services Liability and Content Liability provisions.  The Court further concludes that

23  the exclusions identified by Axis are not applicable.  Accordingly, to the extent Axis seeks

24  dismissal of Teach's claims based on the New Jersey lawsuit, the request for relief is denied.

25  C.    Customer Actions

26        With respect to the customer actions, Axis makes two arguments.  First, Axis contends

27  that, as a matter of law, it had no duty to defend or indemnify either Teach's customers or Teach

28  itself.  Second, Axis contends that, even if it had such a duty, as a matter of law, it still cannot be

held accountable for litigation expenses that Teach incurred in light of the undisputed facts.

### 1.   Duty to Defend or Indemnify

As a preliminary matter, Axis asserts that, as a matter of law, it had no duty to defend or indemnify Teach's customers, who were sued by EI.  Axis points out that, under the policy, "Claim" defined as a "written demand or written assertion . . . *against [the]* **Insured**."  Policy at 10 (italics added).

While this argument has merit, it also sidesteps the main issue – *i.e.*, that written demands were made *against Teach* by its customers.  As to this point, Axis assumes coverage under one of the liability provisions but contends that, even assuming such, an exclusion is applicable, more specifically, Exclusion A.15 (*i.e.*, the exclusion for claims arising out of breach of contract).[16]  *See* Mot. at 16.

### 2.   Exclusion

According to Axis, even if there were coverage under a liability provision in the policy, an exclusion is still applicable – *i.e.*, Exclusion A.15, the breach-of-contract exclusion.  As noted above, Exclusion A.15 provides as follows:

> The **Company** is not obligated to pay **Damages** or **Claim Expense** or defend **Claims** for or arising directly or indirectly out of:
>
> . . . .
>
> 15.   Breach of contract, representation, warranty or guarantee, except for:
>
>     a.   Allegations of breach of contract arising out of any **Insured's** liability that would have attached in the absence of such contract;
>
>     b.   Liabilities **Assumed Under Contract**; . . .
>
>     [etc.]

Policy at 5.

In its papers, Axis contends that the customer indemnity demands against Teach arise out

---

[16] Because Axis has – at least for purposes of this motion – assumed that there is coverage under one of the liability provisions in the policy, the Court need not address the issue.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

of breach of contract because they are ultimately predicated on *Ms. Danielson* having breached *her* contract with EI (*i.e.*, not to create or help create a product to compete with EI's Framework for Teaching Online Program).  But that argument lacks merit for the reasons discussed above.

Axis asserts that, even if the Court rejects the above argument, the customer indemnity demands still arise out of breach of contract because they are also predicated on *Teach* having breached *its* contracts with customers (*i.e.*, a representation and warranty that the software product does not violate any copyrights).  This argument is problematic as well because, at least in part, the customer's claims against Teach do not just arise out of an alleged breach of contract by Teach but also out of Teach's alleged copyright infringement.  In other words, there would be a copyright infringement issue even if Teach never represented to its customers that its product does not violate any copyrights.  That being the case, the first exception to the breach-of-contract exclusion (*i.e.*, liability would attach even in the absence of any contract) would be implicated.[17]  *Compare Medill*, 143 Cal. App. 4th at 831 (concluding that "the tort claims against the directors and officers are not independent of the breach of contract claims" because "[n]o aspect of the underlying bond litigation would exist without the alleged breaches of the loan agreements and indentures and the contractual obligations to pay on the bonds[;] [w]ithout the breaches of the contractual obligations to make repayments on the bonds, there would have been no loss to the bondholders and no recovery against the directors and officers for mismanagement, negligence or breach of fiduciary duty").

3.      Litigation Expenses

Axis argues that, even if the exclusion above is not applicable, it still is not liable for any

---

[17] Whether the customers would have viable claims against Teach is beside the point.  *See Waller*, 11 Cal. 4th at 19 (holding that duty to defend "applies even to claims that are 'groundless, false, or fraudulent'"); *Montrose*, 6 Cal. 4th at 298 (stating that "an insurer may terminate its defense obligation by proving that the underlying claim falls outside the scope of the policy coverage, but not by demonstrating that the claim lacks merit, or might have merit only on some theory outside the scope of coverage"); *Horace Mann Ins. v. Barbara B.*, 4 Cal. 4th 1076, 1086 (1993) (stating that "[a]n insured buys liability insurance in large part to secure a defense against *all* claims potentially within policy coverage, even frivolous claims unjustly brought"; adding that, "[i]f Barbara B.'s claims were indeed so insubstantial as not to warrant any damages, Horace Mann should have raised that defense in the underlying action for Gary Lee's benefit, rather than in this declaratory relief action to his detriment").

1    litigation expenses incurred by Teach with respect to the customer actions based on the undisputed

2    facts. Although not entirely clear, it appears that the bulk of the litigation expenses were incurred

3    between September 2014 (when the customer actions were filed) and November 2014 (when the

4    New Jersey court issued its ordering enjoining prosecution of the customer action). In fact, the

5    Pittsburgh lawsuit was dismissed in October 2014 before the New Jersey's order was issued. As

6    for the New York and Rochester lawsuits, they were not dismissed until July 2015. However,

7    based on the Court's review of the docket sheets for those cases, there does not appear to have

8    been much litigation after the New Jersey court's November 2014 order.

9         As a preliminary matter, the Court takes note that Plaintiffs have not appeared to make any

10   argument in response to Axis's litigation expense argument. *See* Opp'n at 21. Because Plaintiffs

11   failed to make a responsive argument, it has waived any opposition thereto, and thus the Court

12   concludes that Axis is not liable for litigation expenses incurred solely in the customer actions.

13        Moreover, Axis's position seems to have merit, at least as to one of the customers. Axis's

14   obligations under the policy are not triggered until there is a Claim, and Claim is defined as a

15   *written* demand.[18]  *See* Policy at 10 (defining "Claim" as a "written demand or written assertion of

16   a legal right made against [the] Insured seeking **Damages** or non-monetary relief"). Here, there is

17   evidence that Rochester did not make a written demand until well after November 2014 (when the

18   New Jersey court enjoined prosecution of the customer actions).

19        More specifically, it does not appear that Rochester made a written demand until March

20   27, 2015. *See* Compl., Ex. K (in an e-mail, dated March 27, 2015, "demand[ing] that Teachscape

21   provide defense and indemnification to [Rochester]"). Admittedly, Rochester did send a written

22   communication to Teach in September 16, 2014, but that communication cannot reasonably be

23   construed as a written demand. Rochester simply stated: Rochester "is simply Teachscape's

24   customer here and an innocent bystander to whatever disputes there are between EI and

25   Teachscape. *Hopefully*, Teachscape will step up and deal with the lawsuit on [Rochester's]

26

27   _____

28   [18] Axis asserts that it had no obligations until it received *notice* of the written demand, and while it knew about the customer lawsuits in October 2014 (*i.e.*, shortly after the actions were filed in September 2014), it did not get notice of any written demand until April 3, 2015. *See* Mot. at 22.

behalf." Compl., Ex. K (e-mail) (also stating that "I anticipate reviewing the matter in detail and

*exploring* [Rochester's] legal rights to demand defense and indemnification") (emphasis added).

*See, e.g.*, *Winkler v. Nat'l Union Fire Ins. Co.*, 930 F.2d 1364, 1367 n.4 (9th Cir. 1991) (indicating

that "to constitute a 'claim' a 'demand for something due or believed to be due' must be made";

"apart from general allegations of wrongdoing, there was never a concrete assertion of legal right,

only a recognition that the heirs would seek legal counsel in anticipation of *possible* legal action").

### III.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Axis's motion for

judgment on the pleadings. More specifically, the motion is denied in its entirety, except that the

Court grants Axis relief with respect to litigation expenses incurred solely in the customer actions.

This order disposes of Docket No. 31.


**IT IS SO ORDERED**.


Dated: April 26, 2016

_____
EDWARD M. CHEN
United States District Judge